# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MORRIS, JUETTEN, and MURDOUGH
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Captain ALEX H. BEAN**
**United States Army, Appellant**

ARMY 20240529

Headquarters, U.S. Army Center for Initial Military Training and Fort Eustis
Adam S. Kazin and Pamela L. Jones, Military Judges
Colonel Catherine L. Brantley, Special Trial Counsel

For Appellant: Captain Emily R. Ittner, JA; Scott R. Hockenberry, Esquire (on brief); Captain Emily R. Ittner, JA; Scott R Hockenberry, Esquire; Brian A. Pristera, Esquire (on reply brief).

For Appellee: Colonel Richard E. Gorini, JA; Major Stephen L. Harmel, JA; Captain Andrew T. Bobowski, JA (on brief).

19 March 2026

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

MURDOUGH, Judge:

When the government charges an accused with a litany of crimes, it must prove every element of every offense. This includes the requisite *mens rea*, the "terminal element" of an Article 134 offense, and any facts that are necessary to render an otherwise permissible act criminal. Each offense must stand on its own, and proof of guilt for one offense carries no inference of guilt for any other offense. In this case, the government failed to meet this standard, and we set aside the majority of the appellant's convictions.

A general court-martial consisting of an officer panel convicted appellant, contrary to his pleas, of six specifications of attempted patronizing of prostitution, four specifications of soliciting another to commit prostitution, one specification of

domestic violence, one specification of extramarital sexual conduct, and four specifications of indecent conduct in violation of Articles 80, 82, 128b and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 882, 928b, and 934 [UCMJ]. The military judge sentenced appellant to a dismissal[1] and to forfeit $3,000 per month for five months.

Appellant raises seven assignments of error, the bulk of which assert that every guilty finding is factually and legally insufficient. Each of these assertions, to varying degrees, merits discussion and relief.[2]

---

[1] In her announcement of the sentence, the military judge announced this portion of the sentence as "to be discharged from the United States Army" rather than "to be dismissed from the United States Army." Concomitantly, she added a written worksheet to the record as an appellate exhibit, indicating a sentence of forfeitures as described and "a dismissal." The Statement of Trial Results (STR), incorporated into the Judgment and signed near contemporaneously with the announcement of the sentence, likewise indicates a sentence of dismissal. Appellant did not request the military judge clarify the sentence upon announcement, did not request a post-trial Article 39(a) session to correct the announcement of the sentence, and did not file an objection or motion asserting a defect in the STR upon receipt. *See generally* Rule for Courts-Martial [R.C.M.] 1007(c), 1104(b)(1)(D). Now, for the first time on appeal, appellant asserts the military judge's erroneous announcement of sentence voids this portion of the sentence. Our superior court held in *United States v. Bell*, 8 U.S.C.M.A. 193, 194-95, 24 C.M.R. 3, 4-5 (1957), that a sentencing authority errantly announcing a sentence of "dishonorable discharge" rather than a "dismissal" for an officer was a matter of "terminology, not of substance," and this misspoken term did not entitle the appellant to the windfall of vacating his punitive separation. We held the same in *United States v. Carbo*, 37 M.J. 522 (A.C.M.R. 1993). Appellant, however, asserts that this case is different from *Bell* because the military judge only said "discharged" rather than "dishonorably discharged." We disagree; there is no material difference in the terms – they are functionally identical. *See Bell*, 8 U.S.C.M.A. at 195, 24 C.M.R. at 5 ("there is no magic in the words 'to be dismissed' . . . . failure to observe technical nicety does not destroy the substance of the court's determination. The *meaning* of the court-martial sentence is clear. The form in which the sentence is executed can be made to conform to the technical requirements . . . ." (emphasis in original)). There is only one form of punitive separation that a general court-martial may impose on an officer, and that is a dismissal. R.C.M. 1003(b)(8)(A). The judgment properly and clearly reflects the true sentence of the court-martial.

[2] As a threshold manner, other than the domestic violence specification, every specification of which appellant was convicted alleged a completed or inchoate

(continued . . .)

## BACKGROUND

In May 2023, appellant's wife received a text message from an anonymous individual asserting that the appellant was cheating on his wife. Appellant's wife testified that this individual sent her screenshots of the appellant's online dating profile and text messages to establish his infidelity.

Appellant's wife then retrieved appellant's old mobile phone. Using their shared password, she unlocked the phone and discovered multiple text messages and pictures appellant had exchanged with sundry women. She called appellant, and initially he denied any wrongdoing. She accused him of lying and said that she had seen what was on his phone.

When appellant came home, his wife confronted him with words to the effect of "I saw these text messages. Did you sleep with somebody? Did you physically sleep with somebody – and physically cheat on me?" He responded, "yes." He further told her that he had done it the summer prior at a hotel.

Appellant and his wife then separated and began the process to initiate a divorce, however they agreed to maintain shared responsibility for their children. About a week after the confrontation over the messages, appellant came to the house to take their children to a class. After taking the children out to the car, appellant came back into the house saying he forgot clothes for one of the children. When he came back to the house, he took his wife's phone and left. Appellant's wife, who was a nurse, used the phone to communicate with her patients as well as for personal use.

Appellant's wife ran after appellant, and as he was trying to get into the car to leave, she told him to return her phone. He responded, "No, I'm not giving it back,"

---

(. . . continued)
violation of Article 134, UCMJ, and specifically that appellant's conduct was both "to the prejudice of good order and discipline in the armed forces" and "of a nature to bring discredit upon the armed forces," commonly referred to as "clause 1 and 2" offenses, respectively. *See Manual for Courts-Martial, United States* (2019 ed.) [*MCM*], pt. IV, ¶ 91.c(1) (explaining that "clause 1" offenses involve conduct to the prejudice of good order and discipline in the armed forces, while "clause 2" offenses involve conduct that is of a nature to bring discredit upon the armed forces). Appellant alleges, and the government on appeal does not dispute, that there is no evidence in the record to support any conviction for conduct prejudicial to good order and discipline. We agree; the record is completely devoid of any evidence that would support a "clause 1" conviction. For the two pertinent specifications that otherwise survive our review, we take appropriate relief by dismissing that language in our decretal paragraph.

or words to that effect. He then took one of the children and placed him in the car. Appellant's wife grabbed their other child, held him in her lap, and got into the front seat next to the appellant, who began driving. At multiple points, including at least once before getting into the car, he told her words to the effect of "I'm not stopping until I get my phone back." At trial, she testified that she and the children were scared and crying because of his behavior while driving. She called her mother using her Apple watch; her parents called the police. Appellant's wife told him that the police had been called and that there would be a military protective order emplaced against him. She testified that, when appellant stopped at a stop sign, he put the car in reverse, nearly hitting another car and causing her to scream, and then pulled into a parking spot. Appellant returned her phone.

Meanwhile, by this point, appellant's wife had already given appellant's phone to her parents, who eventually turned it over to law enforcement. Following a digital forensic examination, law enforcement obtained seventeen text message exchanges, some of which included photographs of the appellant and various women, including some sexually explicit photographs and photographs of the appellant in a military uniform. Though law enforcement attempted to identify some of the individuals on the other end of these digital conversations, none of these efforts succeeded.

These text messages formed part of the basis for the allegation of extramarital sexual conduct and the sole factual evidence for every allegation of indecent conduct, attempted patronizing of prostitution, and soliciting prostitution. At trial, with the concession of the government, the military judge admitted only the appellant's portions of these conversations as substantive evidence. She admitted the other participants' messages only for the limited purpose of showing their effect on appellant, if any.

At trial, the government called a former Army officer to testify.[3] In part, his testimony focused on the terminal element of the completed and inchoate violations of Article 134, UCMJ. The trial counsel briefly summarized each specification and asked this former officer words to the effect of whether he believed that the conduct the trial counsel described was of a nature to bring discredit upon the armed services. In each instance, the witness agreed, with little elaboration, that it would be.

---

[3] While on active duty, this officer had been appointed to conduct an administrative command investigation into the initial allegation of extramarital sexual conduct, before law enforcement assumed investigatory jurisdiction over the case.

## LAW AND DISCUSSION

### A. Standards of Review

We review legal sufficiency de novo. *United States v. Robinson*, 77 M.J. 294, 297 (C.A.A.F. 2018) (internal quotation marks omitted) (citation omitted). "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 297-98 (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)).

We review factual sufficiency of a conviction under Article 66(d)(1)(B), UCMJ:

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon request of the accused if the accused makes a specific showing of a deficiency in proof.
>
> (ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—
>
>> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and
>>
>> (II) appropriate deference to findings of fact entered into the record by the military judge.
>
> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

If the "trigger conditions" (assertion of error and showing of deficiency) are met, we may review for factual sufficiency. *Id.* To be "clearly convinced that the finding was against the weight of the evidence . . . [we] must decide that the evidence as [we] . . . weigh[] it, does not prove that the appellant is guilty beyond a reasonable doubt. Secondly, [we] must be clearly convinced of the correctness of this decision." *United States v. Harvey*, 85 M.J. 127, 132 (C.A.A.F. 2024) (emphasis omitted).

Throughout the remainder of this opinion, when performing our factual sufficiency review, we constrain our review of the evidence to the same degree as it was presented to the members. Specifically, when we consider each text message conversation that forms the basis for a conviction, we do not rely on any messages sent by people other than appellant as substantive evidence to support a conviction, merely what, if any, effect these messages may have had on the appellant.

*B. Appellant's conviction for domestic violence is factually insufficient*

Appellant was convicted of domestic violence by committing an offense (wrongful appropriation of his wife's phone, in violation of Article 121, UCMJ), "with the intent to threaten and intimidate" his wife. Appellant asserts that this conviction is legally and factually insufficient for two reasons: first, his wife did not have a superior right to possession of her phone, and, second, appellant did not act with the specific intent to threaten and intimidate. We agree in part.

We agree that appellant did not take or retain the phone with the intent to threaten and intimidate his wife. Both at trial and on appeal, the government points to appellant's frightening behavior while entering and driving the car as evidence of his intent to threaten and intimidate.[4] To the extent his wife felt threatened or intimidated, and to the extent that was appellant's intent, the record indicates it was appellant's conduct in the car rather than the taking of the phone that produced this result. Rather, the record shows clearly that appellant's intent in taking his wife's phone was to compel her to return his own. He believed she had wrongfully withheld his phone from him, and he responded in kind. The evidence as we weigh it does not prove this element beyond a reasonable doubt, and we are clearly convinced of the correctness of our decision.

Appellant further argues that the evidence is insufficient to show that the victim had a superior right of possession in her phone. We disagree, and therefore we affirm a conviction for the lesser included offense of wrongful appropriation.[5]

---

[4] The government also points to an alleged violent altercation that occurred the day before as evidence of his intent. Appellant was charged with domestic violence for, yet was acquitted of, this allegation. Though charged misconduct can be used in support of another specification for a non-propensity purpose like intent, *see United States v. Hyppolite*, 79 M.J. 161 (C.A.A.F. 2019), that theory was not presented at trial in this case. Even if the record supported the government's argument on appeal, we will not affirm a conviction based on a theory not presented at trial. *United States v. English*, 79 M.J. 116, 122 (C.A.A.F. 2019)

[5] Both parties at trial agreed that this was a lesser included offense of the charged offense, and the members were instructed on it.

On direct examination, appellant's wife justified her taking of his phone because she termed it "marital property." She also clarified that both phones shared a common password and were paid for by "joint funds." At trial and on appeal, appellant similarly and repeatedly described her phone in the same terms, as "marital property," arguing that she did not have a superior right of possession in the phone. *See MCM*, pt. IV ¶ 64.c.(1)(d) (noting that a taking is not "wrongful" "if done by a person who has a right to the possession of the property either equal to or greater than the right of one from whose possession the property is taken.").The term "marital property" has great legal significance in some areas of the law, such as family law or estate law. But that term, uttered by a lay witness, is not dispositive in the criminal law of wrongful appropriation.

Our superior court has, in other contexts, extended the classic "bundle of sticks" analogy to not just the physical hardware of a phone but the digital contents as well. *See United States v. Secord*, 86 M.J. 56, 2025 CAAF LEXIS 646, at *11-12 (C.A.A.F. 30 July 2025) (recognizing "the digital contents of a cell phone and the physical cell phone itself are distinct with respect to legal questions . . . ."). Also crucial is "whether [a] third party has joint access or control of the property for *most* purposes." *United States v. Black*, 82 M.J. 447, 451 (C.A.A.F. 2022) (emphasis added) (citing *United States v. Rader*, 65 M.J. 30, 32 (C.A.A.F. 2007); Mil. R. Evid. 314(e)(2)). In this case, while appellant may have had *some* possessory interest in the phone, his wife—who was the primary owner and user of the phone and who used it for both personal and professional purposes, including communication with her nursing patients—had a greater right of possession in both the physical phone and the information it contained. The mere fact that appellant had *access* to the contents of his wife's phone when he was in physical possession of it does not change this calculus. *See, e.g., id.* at 452 ("Neither the Supreme Court nor this Court has ever held that the scope of a person's common authority over property is coextensive with that person's access to the property.").

Appellant had an inferior right of possession in his wife's phone, which he took without her consent and with intent to temporarily deprive her of its use and benefit. The evidence is legally and factually sufficient to establish the lesser included offense of wrongful appropriation.

*C. Appellant's conviction for extramarital sexual conduct is factually insufficient*

*1. Additional Facts*

Though appellant's wife testified that she had received screenshots and text messages from an unknown individual, showing that her husband had been cheating on her, the screenshots she received were never presented at trial. She also testified her husband responded "yes" to her compound question: "did you sleep with somebody? Did you physically sleep with somebody and—and physically cheat on

me?" and generally described where and when his infidelity occurred. She did not testify to any further details about this extramarital encounter.

Later in the trial, the government introduced into evidence seventeen exhibits via testimony of a law enforcement agent. Each exhibit contains a text message conversation between the appellant and someone purporting to be another woman. The government argued at trial and on appeal that Prosecution Exhibit (PE) 1 was an exchange between the appellant and the woman he admitted to sleeping with and supports the allegation of extramarital sexual conduct. In PE 1, the appellant and a woman exchange both nude and non-sexual photographs, including two photographs of appellant in a military uniform, and he sends several explicit messages expressing a desire to have sexual intercourse with her, but no message directly establishes that it actually occurred.

The government never presented PE 1, or any other documentary exhibit, to appellant's wife and asked her if any of the messages matched the screenshots she had received on her own phone, nor did the government otherwise introduce screenshots or any other evidence obtained directly from her phone.

*2. Discussion*

Appellant argues that the evidence is insufficient to establish: (1) genital-to-genital sexual intercourse as alleged in the specification, and (2) the terminal element that the conduct was service discrediting. We agree, primarily because we determine that the evidence does not sufficiently establish that the person appellant admitted to "sleep[ing] with" in the conversation with his wife and the person with whom he communicated in PE 1 are the same person.

The government relies on PE 1, primarily the photographs of appellant in uniform, to meet the service-discrediting element of the offense. The government asserts that PE 1 "corroborates" his statement to his wife, because it is purportedly the same person. This is conjecture. Other than the overlap in the general timeframe, nothing in the record connects the two.

Without a nexus between the wife's testimony and PE 1, the terminal element fails. Even if we accept the inference that "sleep[ing] with" someone implies genital-to-genital sexual intercourse, the conversation between appellant and his wife establishes at best the *actus reus* of the offense. In addition to the act itself, to sustain a conviction for extramarital sexual conduct, the government must establish sufficient facts and circumstances to establish that the conduct was of a nature to bring discredit upon the service. *United States v. Wells*, 85 M.J. 154, 156-57 (C.A.A.F. 2024) (reaffirming that "whether conduct is of a nature to bring discredit upon the armed forces is a question that depends on the facts and circumstances;" the government must present sufficient facts and circumstances that prove this

element beyond a reasonable doubt (quoting *United States v. Phillips*, 70 M.J. 161, 166 (C.A.A.F. 2011))). Nothing in this brief conversation between appellant and his wife establishes that his conduct was of a nature to bring discredit upon the service, especially given the private manner in which it occurred. *See also United States v. Coleman*, 79 M.J. 100, 104 (C.A.A.F. 2019) ("the terminal element of an Article 134, UCMJ offense is not inherently included within other elements and is instead a separate and distinct element that the government must prove" (citation omitted)); *United States v. Richard*, 82 M.J. 473, 474 (C.A.A.F. 2022) ("the terminal element of Article 134, UCMJ must be proven beyond a reasonable doubt and cannot be conclusively presumed based on the accused's conduct"); *see also MCM*, pt. IV, ¶ 99.c.(1) ("extramarital conduct that is private and discreet in nature may not be service discrediting . . . ."). And regardless of whether appellant's photographs of himself in uniform might be sufficient circumstantial evidence to establish discredit to the service, nothing in PE 1 indicates that he actually "slept with," i.e. engaged in extramarital genital-to-genital sexual intercourse with, the person on the other end of his text messages in that exhibit.

In short, the evidence does not establish each element of the offense beyond a reasonable doubt, and we are clearly convinced of the correctness of this decision.

## D. *Appellant's convictions for indecent conduct are legally and factually insufficient*

Appellant was convicted of four specifications of indecent conduct for text messages he sent "to a person, not his wife." The general nature of these conversations is the appellant pursuing a sexual relationship with another woman. The particular language alleged in each specification ranges from extremely graphic to facially innocuous.

Appellant asserts that none of these statements satisfy the legal standard for indecency.[6] We have our doubts as to whether some of these statements meet that standard, particularly Specification 4 of Charge III, which alleges that: "'What are you willing to do for your SD[7]?' 'Are you willing to be physically affectionate'; and 'I am primarily interested in in person, Physical [sic] affection,'" are criminally indecent. Regardless of whether these statements would satisfy the legal standard

---

[6] "'Indecent' means that form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations." *MCM*, pt. IV, ¶ 104.c.(1).

[7] Evidence at trial established that "SD" is an abbreviation for "sugar daddy."

for indecency, we are clearly convinced for other reasons that appellant's conduct does not satisfy the elements of indecent conduct.[8]

At trial, appellant asserted, as he continues to assert on appeal, that these conversations amounted to private behavior between consenting adults and thus cannot not be criminalized as indecent conduct. "In the absence of an aggravating circumstance, private consensual sexual activity . . . is not punishable as indecent conduct." Dep't of Army, Pam. 27-9, Legal Services: Military Judges' Benchbook, para. 3A-71-1.d n.2 (29 Feb. 2020); *accord United States v. Marcum*, 60 M.J. 198, 207-08 (C.A.A.F. 2004); *United States v. Goings*, 72 M.J. 202, 204-05 (C.A.A.F. 2013). In response, the government at trial pointed to the language of each specification, that the communication was made to "a person, not his wife," as the "aggravating factor" that would permit the criminalization of otherwise private consensual sexual activity.[9]

Our superior court's decision in *United States v. Hullett* refutes the government's position.

> It is not a *per se* violation of the military community's standards of decency for an adult male to suggest to an adult female that they have a sexual relationship. . . . If one of the consenting adults is married to someone else, the adulterous nature of the sexual intercourse does not make the act of intercourse "indecent," although it may make it illegal.

40 M.J. 189, 191-92 (C.A.A.F. 1994) (citations omitted). Appellant proposed sexual activity, sometimes graphically, in private, consensual discussions with other adults. The bare fact that appellant was not married to any of the people to whom he sent

---

[8] In addition to legal and factual sufficiency, appellant also separately challenges these specifications on constitutional and fair notice grounds. We resolve these specifications on legal and factual sufficiency, although the authorities we cite rely in part on First and Fifth Amendment doctrines. Beyond our reliance on these authorities, we do not further address the appellant's additional assignments of error with respect to these specifications.

[9] On appeal, the government appears to have retreated from this position and suggests that the obscene (i.e. indecent) nature of the communications is itself sufficient to make them criminal and that the extramarital nature of the communication "merely shows aggravation" to establish the service-discrediting element of the offense. But assuming without deciding that the government is correct, even obscene sexual communication, privately expressed between consenting adults, is not punishable as "indecent conduct."

these messages is legally and factually insufficient to support a conviction for indecent conduct. And the government neither proffered nor proved any other fact that would otherwise support the criminalization of this language.

We also find the evidence both factually and legally insufficient with respect to the terminal element. Though charged as "indecent conduct," the sole basis for these convictions is the appellant's speech.[10] When a servicemember's speech is the sole basis for an offense under Article 134, UCMJ, the government must prove a "direct and palpable connection between speech and the military mission" to satisfy the terminal element, regardless of whether the theory of liability is "prejudicial to good order and discipline" or "service discrediting." *United States v. Wilcox*, 66 M.J. 442, 448-49. (C.A.A.F. 2008). "If such a connection were not required, the entire universe of servicemember opinions, ideas, and speech would be held to the subjective standard of what some member of the public, or even many members of the public, would find offensive." *Id.* at 449.

The sole evidence to establish the terminal element consisted of the trial counsel summarizing each specification to a former officer and asking him if he considered this conduct to be service discrediting. There is no evidence in the record that appellant's messages had any direct or palpable connection to the military mission.[11] The evidence is legally and factually insufficient to establish this element of each indecent conduct specification.

### E. The attempt and solicitation convictions

The remaining charges and specifications allege inchoate violations of the Article 134 enumerated offense of pandering and prostitution. The six attempt specifications (Charge IV) each allege that the appellant attempted to procure genital-to-genital sexual intercourse in exchange for money. Two of the four solicitation specifications (Charge V) likewise allege that the appellant solicited genital-to-genital sexual intercourse in exchange for money, one alleges that the appellant solicited oral-to-genital sexual intercourse in exchange for money, and one

---

[10] Appellant asserts that, because there is a separate, presidentially-enumerated offense of "indecent language" under Article 134, UCMJ, the government is precluded from using the offense of "indecent conduct" to criminalize conduct that is solely based on speech, citing *United States v. Mendoza*, 85 M.J. 213 (C.A.A.F. 2024). Because we resolve this issue on other grounds, we need not address the extent of *Mendoza*'s application to Article 134 enumerated offenses.

[11] In one of the four text exchanges at issue, appellant sent a photograph of himself in uniform. Under the facts of this case, merely sending a photograph in uniform, without more, is insufficient to establish a "direct and palpable connection to the military mission"

alleges that the appellant solicited both genital-to-genital and oral-to-genital sexual intercourse in exchange for money. The appellant again challenges each of these convictions as legally and factually insufficient. Only the solicitations of oral-to-genital intercourse survive our review.

*1. Additional facts*

The sole factual basis for each attempt and solicitation specification were text message conversations between the appellant and unidentified third parties who purported to offer sex in exchange for money, i.e. a prostitute.[12] For the six attempt specifications, the messages from appellant indicated he had taken steps toward effectuating the bargained-for-exchange, for example procuring condoms or driving to the agreed-upon meeting location.

At trial, the government presented the lay opinion testimony of a law enforcement agent to define some of the terms and acronyms featured in appellant's conversations, that, per the agent's testimony, people involved in prostitution commonly used. For example, "Bbj" was short for "bareback blowjob," i.e., oral-to-genital intercourse without a condom. The trial counsel asked, "is it common in that area to refer to prostitution as offering services?" and the agent responded "Yes." The agent did not identify any colloquialism or shorthand specifically for genital-to-genital sexual intercourse.

In his text messages with the various purported prostitutes, appellant often expressed an interest in or desire to receive "services," generically, whether a "qv" ("quick visit") or "ss" ("short stay"). He made frequent queries into the recipients' respective "rate" or "donation" (a euphemism for "price," per the agent's testimony). In three message exchanges, appellant specifically asked the recipient for "bj" or "bbj." In another, appellant offered to pay the recipient $100 to "go down on [her]" and "make [her] climax."

---

[12] For most of these offenses, there are some messages between appellant and the purported prostitutes at or near the charged dates, and others that are several weeks and months removed. The government relies in part on some of these temporally distant messages to support its argument for the sufficiency of these convictions. Because, as described *infra*, we are clearly convinced that the government did not prove beyond a reasonable doubt appellant's intent to engage in genital-to-genital intercourse, we do not address the murkier question of whether the government proved that these inchoate offenses, including the requisite specific intent elements, occurred "on or about" the charged dates or to what extent these temporally distant messages could satisfy the government's burden.

## 2. *Discussion*

### a. *The charged genital-to-genital acts*

Both the crimes of attempt, in violation of Article 80, UCMJ, and solicitation, in violation of Article 82, UCMJ, require the accused to act with the specific intent that the predicate offense actually be committed. *See* UCMJ art. 80(a); *MCM*, pt. IV, ¶ 6.b.(2). For eight of the ten inchoate offenses at issue in this case, the government solely alleged that appellant intended to engage in genital-to-genital sexual intercourse. These convictions are factually insufficient, because appellant does not convey specific intent for genital-to-genital sexual intercourse in his messages, whether expressly or though euphemisms and innuendo.

Circumstantial evidence coupled with reasonable inferences can meet the government's burden of proof beyond a reasonable doubt. *E.g.*, *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019). But it did not do so here. Nothing in the evidence of record establishes that "services," "quick visit," or "short stay," exclusively, predominantly, or presumptively equated to genital-to-genital intercourse, as opposed to any other item on the potential menu of sexual (or non-sexual)[13] acts. The government avers that appellant's occasional references to procuring condoms signals an inference that he intended to engage in genital-to-genital intercourse; however, we agree with appellant that condoms are potentially worn for a variety of sexual activities, including but not limited to oral-to-genital intercourse.[14] The government alleged specific intent to commit a specifically defined act, and did not prove it beyond a reasonable doubt.

One reason, though not the only reason, that we are clearly convinced in the correctness of our decision is because the only sex acts appellant ever specifically sought were oral-to-genital. *See Harvey*, 85 M.J. at 132. This includes references to a "bj" or "bbj" in support of specifications where the government nonetheless *only* alleged specific intent to engage in genital-to-genital intercourse.

---

[13] In the evidence supporting Specification 1 of Charge V, appellant asked if the "service" includes a massage. Whether "massage" was a euphemism for something else is not established in the record.

[14] That the participants in these conversations seem to have common understanding and usage in the specific nuance in the term "bbj," to particularly describe oral-to-genital intercourse without a condom, bolsters this inference that condoms are at least sometimes used when oral-to-genital intercourse occurs in exchange for money.

### b. The charged oral-to-genital acts

For the same reason, however, we find the two convictions for soliciting oral-to-genital intercourse in exchange for money to be legally and factually sufficient. Appellant asked one person, "how much [money] for carplay? Bj." He also offered to pay another person $100 to "go down on" her and "make [her] climax." Under the standard of factual sufficiency review and giving appropriate deference to the trier of fact, the terms "bj" (short for "blowjob") and "go down on" are sufficiently within the general knowledge and common understanding of the average trier of fact to mean oral-to-genital intercourse, and this is sufficient circumstantial evidence of solicitation of prostitution.

For these two specifications, appellant further argues the convictions amount to a legal "impossibility," under the premise that the person solicited must be subject to the UCMJ to satisfy the terminal element of the predicate offense. We disagree. By that logic, soliciting prostitution could never be a crime unless the prostitute was subject to the Code. We agree with our sister court's opinion that "the solicitation of another person to commit an offense that, if committed by one subject to the UCMJ, would be punishable under the UCMJ, is an offense cognizable under Article 82(a), UCMJ." *United States v. Heppermann*, 82 M.J. 794, 801 (A.F. Ct. Crim. App. 2022), pet. denied, 83 M.J. 103 (C.A.A.F. 2022). This is true even if the predicate offense is a violation of Article 134 that requires proof that the solicited conduct be service discrediting. *Id.* (citing *Phillips*, 70 M.J. at 163-65, in affirming a conviction for solicitation of production and distribution of child pornography when the conduct was "of a nature to bring discredit upon the armed forces"). In this case, the trier of fact determined that the evidence established this element (or, more precisely, that the appellant acted with specific intent that every element, including this one, of the solicited offense be completed). We are not clearly convinced that this finding was against the weight of the evidence.

### F. The sentence

In light of our decision on the findings, we now turn to the sentence, considering the principles established by our superior court in *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013).

By reducing the number of convictions from sixteen to three, we have drastically altered the penalty landscape and exposure appellant would have faced. As such, we are not confident what a military judge would have done with far fewer convictions, particularly given the unitary nature of the sentence imposed. Moreover, the gravamen of the offenses has changed – the original findings painted the appellant as a domestic abuser and prolific (if mostly unsuccessful) philanderer. The remaining findings are far more limited. And finally, though we are experienced practitioners, the offenses surviving appellate review are less frequently charged

than most others. We are not able to reliably determine what the sentence at trial would have been.

We cannot fairly reassess the sentence ourselves, and we therefore set the sentence aside and authorize a rehearing on the sentence for the remaining findings of guilt.

## CONCLUSION

The findings of guilty for Charge III and its specifications, Charge IV and its specifications, and Specifications 1 and 6 of Charge IV are SET ASIDE. These charges and specifications are DISMISSED.

We AFFIRM a finding of guilty for only so much of Specification 2 of Charge II and Charge II, as it alleges a violation of Article 121, UCMJ, as reads:

> In that [appellant], U.S. Army, did, at or near Odenton, Maryland, on or about 10 May 2023, wrongfully appropriate a cellular phone, of some value, the property of [the victim].[15]

We AFFIRM a finding of guilty for Charge V and only so much of Specification 4 of Charge V as reads:

> In that [appellant], U.S. Army, did, at or near Odenton, Maryland, on or about 24 June 2022, wrongfully solicit a person to wrongfully engage in a sexual act to wit: oral to genital sexual intercourse, with [appellant], a person not their spouse, for the purpose of receiving money, and that such conduct was of a nature to bring discredit upon the armed forces, by saying to that person, "Do you offer outcall or carplay?" and "How much for carplay? Bj," or words to that effect.

We AFFIRM a finding of guilty for only so much of Specification 5 of Charge V as reads:

> In that [appellant], U.S. Army, did, at or near Odenton, Maryland, on or about 26 April 2023, wrongfully solicit a person to wrongfully engage in a sexual act to wit: oral to genital sexual intercourse, with [appellant], a person not

---

[15] The victim's full name appears on the original charge sheet.

their spouse, for the purpose of receiving money, and that such conduct was of a nature to bring discredit upon the armed forces, by saying to that person, "Do you have a price sheet?"; "Would you do my place for $150"; and "$100, go down on you. Make you climax," or words to that effect.

The sentence is SET ASIDE. A rehearing on the sentence is authorized.

We order restored all rights, privileges, and property of which appellant may have been deprived by virtue of the findings that we have set aside herein.

Senior Judge MORRIS and Judge JUETTEN concur.

FOR THE COURT

//JAMES W. HERRING, JR.//
Clerk of Court